JAMES E. WHITMIRE, ESQ.
Nevada Bar No. 6533
jwhitmire@santoronevada.com
JAMES M. JIMMERSON, ESQ.
Nevada Bar No. 12599
jjimmerson@santoronevada.com
SANTORO WHITMIRE
10100 West Charleston Blvd., Ste. 250
Las Vegas, Nevada 89135
Telephone:    702/948-8771
Facsimile:    702/948-8773

*Attorneys for Plaintiff Las Vegas
Metropolitan Police Department*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT,<br><br>                    Plaintiff,<br><br>          v.<br><br>HARRIS CORPORATION, M/A COM, INC., TE CONNECTIVITY LTD., TE CONNECTIVITY INC., TE CONNECTIVITY NETWORKS, INC., TYCO ELECTRONICS CORPORATION, TYCO ELECTRONICS, LTD.<br><br>                    Defendants. | Case No:  2:13-cv-01780-GMN-VCF |

## REVISED THIRD AMENDED COMPLAINT[1]

LAS VEGAS METROPOLITAN POLICE DEPARTMENT ("Plaintiff" or "LVMPD"), by and through its attorneys of record of the law firm Santoro Whitmire, as and for its Third Amended Complaint, alleges as follows:

---

[1] Various claims for relief are asserted herein.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

## **PARTIES**

1.     LAS VEGAS METROPOLITAN POLICE DEPARTMENT ("LVMPD" or "Plaintiff") is an entity doing business in Nevada.

2.     HARRIS CORPORATION ("Harris") is an entity which contracted to do business with LVMPD in the State of Nevada.  Harris includes Harris Corporation and any of its divisions, including but not limited to its RF Communications Division.

3.     M/A COM, INC. ("M/A COM) is an entity which contracted to do business with LVMPD in the State of Nevada.  M/A COM, INC. includes any of its divisions, successors and/or any other entity that may be legally and/or financially responsible for transactions occurring with LVMPD (including but not limited to TE CONNECTIVITY LTD., TE CONNECTIVITY INC., TE CONNECTIVITY NETWORKS, INC., AND/OR TYCO ELECTRONICS CORPORATION AND/OR TYCO ELECTRONICS, LTD.).  All persons or entities encompassed in this paragraph shall be collectively referred to as "M/A COM" for ease of reference.

4.     TE CONNECTIVITY LTD., TE CONNECTIVITY INC., TE CONNECTIVITY NETWORKS, INC., AND/OR TYCO ELECTRONICS CORPORATION AND/OR TYCO ELECTRONICS, LTD. were named as Defendants to ensure that entities associated with M/A COM, INC. and/or HARRIS CORPORATION were joined and to avoid any misnomer issues. References to M/A COM subsume these entities.  The naming of these entitles was done for precautionary reasons as discovery has not yet occurred.  This reference is also included in the Second Amended Complaint given that the difference between Doe pleading rules in Nevada State Court and Federal Court.

5.     M/A COM is the entity which originally contracted to do business with LVMPD. In 2009, an assignment occurred between M/A COM and Harris, whereby Harris assumed M/A COM's duties and/or other obligations.   M/A COM and Harris are effectively one and the same.

## JURISDICTION AND VENUE[2]

6.   This Court appropriately has subject matter jurisdiction over this action.  *See* 28 U.S.C. § 1332.

7.   Venue is appropriate in the District of Nevada.  *See* 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### The Las Vegas Metropolitan Police Department Needs a New Radio System

8.   Prior to 2005, LVMPD had used an analog Motorola radio system for approximately thirty years.

9.   Due to the population growth of Clark County, new requirements calling for digital radio systems, and concerns that radio systems should have functional interoperability with other state and federal agencies and departments, LVMPD came to the conclusion that the radio communication system it had been using for a number of years needed to be replaced.

10.   In July 2005, LVMPD began to formally explore the replacement of the radio system it had been utilizing.

11.   A notice was published which invited companies to make proposals concerning the replacement of the radio system.  Attached hereto as Exhibit 1 is a true and correct copy of the Requests for Proposal ("RFP") that was published by LVMPD.

12.   The Request for Proposal set forth certain requirements for the new radio system. The requirements included, but were not limited to:

    a.   "Through this RFP, the LVMPD shall procure a new Radio System Infrastructure (RIS) to support all voice and 'low-speed' data communications between the Department's approximately six thousand users.  Due to financial constraints, the purchase of Department's new Radio System shall be administered as two separate procurements."

    b.   The following functionality requirements are vital to daily operations.  They are presented below in no special order of importance:

        i.   a method of "multiple access" such as FDMA or TDMA to make better use of frequency spectrum;

        ii.   Note: FDMA is acceptable only as an interim solution that can be

---

[2]  This case was removed to Federal Court by Defendants.  This jurisdictional/venue statement is included in order to conform to Local Rules of practice.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

migrated to TDMA at no additional cost to LVMPD.   (See Section 1.0.2 for details)

    iii.    a method of improving the efficiency with which channels are utilized (such as Trunking);

    iv.    encryption;

    v.    a method of distributing encryption keys "over the air" (OTAR);

    vi.    a method of "private one-on-one calling" on the Radio System;

    vii.    a method of managing the programming and configuration of the entire fleet "over the air" (OTAP);

    viii.    dispatch override;

    ix.    built-in data port to combine voice/low-speed data onto a single radio infrastructure;

    x.    the use of a "group busy" indication to prevent co-user interference;

    xi.    automatic unit identification with aliases;

    xii.    talk-around;

    xiii.    remote PTT/keying of individual radios;

    xiv.    emergency notification;

    xv.    Global Positioning System (GPS) for vehicle location;

    xvi.    Interoperability.

c.    "1.0.10 Co-User Interference Prevention - Except in the case of Dispatch Override, the RSI shall not permit one member of a talk-group to interrupt (or interfere) with another member, while the latter member is transmitting to the talk-group.  The System shall use a "group-busy" indication to manage this type of contention."

d.    "1.0.10 Co-User Interference Prevention - At the system level, the RSI shall have an *availability* better than or consistent with that expected of Public Safety Radio Communications.  The Proposer must clearly define the expected System Availability, (to one decimal place) for the proposed Radio Infrastructure.  For a definition of LVMPD's Radio Coverage Reliability, refer to Section 1.6 below."

e.    "1.5.1 System Reliability (Availability) - At the system level, the RSI shall have an *availability* better than or consistent with that expected of Public Safety Radio Communications.  The Proposer must clearly define the expected System Availability, (to one decimal place) for the proposed Radio Infrastructure.  For a definition of LVMPD's Radio Coverage Reliability, refer to Section 1.6 below."

f.    "1.5.2 System Maintainability - The Proposer shall include Mean Time Between Failure (MTBF) and Mean Time To Repair (MTTR) data for the proposed RSI within the proposal to demonstrate the maintainability of top ten to fifteen major equipment components (as defined by the Bill of Material) of the RSI.  Where no such data exists because the equipment is a new design,

the Proposer shall include data for the closes like equipment. Where possible, field data from other similar applications in Public Safety, of the same equipment shall be included. Only RSIs that use the standard IP protocol, instead of any proprietary IP versions, in order to ensure that the system is maintainable using standard "off-the-shelf" network devices from multiple manufacturers will be considered.

| Location | % Geographic Coverage | Minimum Rx/Tx. Levels (dBm) for DAQ 3.4 or Better | % of Time Rx / Tx. Levels ≥ Min. Levels | Comment |
|---|---|---|---|---|
| All Metropolitan Areas | 95 | -100 / -102 | 99/99 | Includes in-building levels |
| Paved Roads County-wide | 95 | -100 / -102 | 99/99 | Mobile Radio coverage only |
| Rural Areas County-wide | 90 | -100 / -102 | 99/99 | |

g.   "1.11 TRAINING - The Proposer shall provide a Training Plan, intended to show how the LVMPD personnel, at all levels will be provisioned with the skills to successfully operate the new RSI. Note, training material shall not be included here, only the Training Plan. The Training Plan shall include the Proposer's plan for Technical, User and Dispatcher training. Only on-site training will be accepted. Call-in training will not be accepted. The LVMPD has a staff of ten (10) technicians and six (6) installers that shall be dedicated to support the maintenance requirements of the new RSI. The training proposed therefore must be of sufficient detail and scope to enable LVMPD to fully maintain the new RSI. The Proposer shall permit the LVMPD to video tape the entire training classes for the use by the LVMPD in follow-up training as required."

h.   "1.5 Signal Quality - Signal quality is defined, as the minimum signal required to produce a voice signal with a Delivered Audio Quality (DAQ) of 3.4 as defined in the TIA TSB-88 Bulletin. This audio quality is required for analog, digital, and digitally encrypted modes of operation. An overall signal quality of DAQ 3.4 is required for the system confirmed as part of the acceptance tests. The vendor will supply a signal level relating to this measurement for the test."

i.   "1.6 Data - Mobile data performance should be as good as voice. A single user transmitter for concurrent voice and data is required. NCIC data responses, dispatched traffic, and inter-officer messaging are the main uses for the data terminals and laptops. Each of these applications are short, ASCII text transactions. It is not planned to perform any applications that require fingerprints, photos, or field reports on this system. The network must be able to handle the current data traffic and voice traffic simultaneously without any degradation. LVMPD is currently using a Motorola Data Tac system with an RNC3000 controller. The system measures air traffic in packets of 30 bytes.

Average traffic over a twenty-four hour period is 978 packets per minute. Peak traffic has been measured at 3275 packets per minute."

j.  "1.8 Consoles - The vender is responsible for maintaining the integrity of the dispatch center (MetroComm) and its operation. The vendor is further responsible for any software and/or hardware changes necessary to interface the new radio system to the existing console switch, including any costs incurred."

k.  "6.7 Final Acceptance - The final acceptance of the system will consist of successful completion of all tests in this section, and completion of all items within this specification."

l.  "6.8 Uninterrupted Operation of Current System - The existing communications system employed by LVMPD has built in redundancy in most critical areas. However, it will NEVER be placed in a situation where this redundancy is to be taken for granted. The vendor is responsible for devising a plan that will allow continuous operation of the existing system during all phases of installation and cut over. Scheduling and logistical plans will be reviewed and signed off by all department heads affected by any system work. System changes should appear transparent to the users at all times. A fallback plan will exist, and remain in effect for at least three days (3 X 24 hours) after each change or modification is done to the existing infrastructure. In the event the changes prove detrimental to the effective communications of the department, the vendor will be responsible for correcting the situation at their own expense. The vendor will not attempt to dictate or correct users as to how or when they think things should operate. MetroComm dispatch will always have the last word."

13.     After the Request for Proposal had been published, multiple companies responded with different alternatives for a new radio system for LVMPD.

14.     One of the responses came from M/A COM.

**M/A COM Promises/Represents That It
Would Deliver the Latest and Greatest Radio System to LVMPD**

15.     Touting its history, M/A COM submitted a proposal on September 1, 2005 to replace LVMPD's radio system. M/A COM's proposal is incorporated by reference as if its contents were stated in full herein.[3]

16.     The comprehensive proposal described a state of the art radio system that would, among other things, provide redundancies, reliability, maintainability and interoperability. The

---

[3]  M/A COM's proposal is extremely voluminous and LVMPD is not attaching it as an exhibit so as to avoid inundating the Court with excessive documentation. Accordingly, M/A COM's proposal is incorporated by reference as if its contents were stated in full herein.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

proposal was voluminous and contained detailed representations and statements that were material to, and induced the decision to purchase a radio system from M/A COM.

17.     In connection with the proposal process, the needs of LVMPD were expressly recognized.  In its Proposal submitted to LVMPD in September, 2005, M/A COM noted:

> The tremendous growth of Clark County has surpassed the operational capabilities of LVMPD's current VHF conventional radio system.  With continued growth, it is only a matter of time until the system will no longer be able to serve the needs of the Department's officers.  Thus, after considerable research and deliberation, LVMPD is seeking new technologies to provide a safe, reliable and scalable communication system meeting and exceeding the real-life demands of law enforcement communications.
>
> ***To meet and exceed the demands of law enforcement communications and Southern Nevada, the new communication system must surpass the requirements of redundancy, scalability, reliability, maintainability, RF coverage, availability and interoperability as set forth in the Request for Proposal for Radio System Infrastructure.***  The new system must also preserve both the existing mobile data subsystems in the dispatch console subsystem's assets serving LVMPD today
>
> M/A-Com, Inc. is prepared to join forces with LVMPD to implement a technologically advanced, future-resilient voice and data communication system which will grow alongside the department and accomplish the mission well into the future.

(Emphasis added).

18.     In the proposal, M/A COM confidently stated, "M/A-Com understands complex radio projects and has successfully demonstrated this throughout the world, including our implementation of the Pennsylvania and Florida Statewide radio systems."  It also noted that it was "[t]he proven choice for your communications," that it had a "Proven Record of Innovation," a "Proven Record of Non-obsolescence," and a "Proven Record of Contract Performance."

19.     M/A COM repeatedly touted its ability to meet the particular needs of LVMPD, boldly stating:

> The Las Vegas Metropolitan Police Department's current radio system no longer meets the Department's operational needs and must be replaced.  Any endeavor of such magnitude as replacing a public safety communications system involves risk.  It is prudent to ask questions such as:

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

- Am I buying serial number one?

- Has the vendor implemented similar systems before?

- Have those implementations been successful?

- How can I be sure the system will be implemented on time?

- Am I sure that I know the ultimate cost?

And most importantly:

- Will this new system meet the Department's needs now and into the future?

M/A-Com strongly believes that our approach represents a system design that answers the above questions with the least possible risk to LVMPD and the citizens of Clark County.

20.   M/A COM further discussed "Unique Features" of the system relating to LVMPD as follows:   "Las Vegas Metropolitan Police Department will realize unique features within OpenSky, relating specifically to five key principles: 1. Coverage; 2. Capacity; 3. Cost; 4. Capabilities; 5. Choices."

21.   M/A COM touted its systems "redundancy" and "fault tolerance" stating, "[t]he inherent redundancy and fault tolerance of the OpenSky network is considered to the be the single most robust in the industry, such that the State of New York chose M/A-Com as the radio communication manufacture of choice for the new OpenSky/P25 statewide system."

22.   M/A COM repeatedly referenced "Interoperability," meaning the ability of one public safety department to communicate with another department in a crisis matter (i.e. the ability of the fire department to communicate with the police department in a 9/11 type situation).  In relevant part, the Proposal stated:

Interoperability – Perhaps the strongest word in public safety communications today.  No other communications manufacturer provides interoperability like M/A-Com.

*        *        *

M/A-Com is unmatched in the industry providing the most elegant interoperability solutions for all of its trunked systems.  No other vendor has the variety of options to ensure that interoperable communications meet and exceed the needs of the LVMPD.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

23. The representations made by the expert in the field, M/A COM, were certainly impressive. The Proposal made various references to a letter from then Florida Governor Jeb Bush stating, "[i]n addition to the technical capabilities that OpenSky affords, M/A-Com critical communications systems provide unmatched 'time of crisis' capabilities." Testimonials from other customers were included in M/A Com's proposal such as the following examples:

- Worcester County selected M/A-Com because of superior technology and M/A Com's history and commitment of never again having to totally replace your communications system.

- It's one thing to have our (M/A-Com) representative tell us how wonderful our system is …. It's another thing entirely to see the system live up to its reputation in an emergency.[4]

24. M/A-Com maintained "that a beneficial partnership starts at the beginning with a commitment to price and performance and extends all the way to contract implementation. We guarantee that there will be NO HIDDEN COSTS and NO SURPRISES pushing the project 'out of bounds.'"

25. The representations made by M/A COM also included, but were not limited to:

a. "A combination of High Profile tower sites and M/A-COM's unique single channel 'cell' sites will be used to provide the maximum degree of coverage with minimal impact and construction required."

b. "The single channel cell sites offer both additional capacity in busy areas a "fill-in" coverage targeting hard to reach, terrain limited areas and specific buildings where in-building portable coverage is mandated."

c. Because OpenSky is an end-to-end IP public safety radio system, it provides LVMPD…Fault tolerant design to protect against the worst case scenario."

d. "Collectively, the 26 sites provide wide-area radio-to-radio interconnectivity."

e. "The radio channel protocol is robust under heavy load easily meeting the requirements of Exhibit 1 Section 1.0.9"

f. "The OpenSky protocol provides efficient support of both long messages, such as file transfers, and short messages, such as AVL."

g. "We have designed the system such that in the Metro Area, there are more talk paths available than active talk groups. Therefore all talk groups can be simultaneously active and the system will not queue."

h. "Coverage: Guaranteed Metro: 95% @ 17dB."

---

[4] Testimonial by Richard Rodrique, Kingston, Ontario (emphasis added).

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

i.     "System Capacity: 268 simultaneous talkpaths – 12,000 users."

j.     "Easy to self-maintain."

k.     "Cost Integrity = No Surprises."

l.     "$0 overrun."

m.     It would take 14 months from the award of the contract to final completion.

n.     "The TDMA technology of OpenSky supports four talkpaths per RF channel, providing a four-fold increase in spectrum efficiency over traditional trunked systems."

o.     "The proposed preliminary schedule has the project completion in 14 months. The schedule is aggressive to meet the desired completion time frame as expressed in the RFP."

p.     "Will this new system meet the Department's needs now and into the future? M/A-COM strongly believes that our approach represents a system design that answers the above questions with the least possible risk to LVMPD and the citizens of Clark County."

q.     "Technical Risk Associated with Required Integration and Testing – Minimal"

r.     "Implementation Schedule Risk – Minimal"

s.     "Technology Risk Associated with Developmental Products – Minimal"

t.     "Cost Risk – Minimal"

u.     "The Las Vegas Metropolitan Police Department can be assured that their OpenSky voice and data system will meet the budget and operations and schedule specifications set forth in this Request for Proposal."

v.     "Four (4) simultaneous talk paths are provided in all of the frequency bands/bandwidths…"

w.     "OpenSky's IP architecture delivers the most cost-effective solution for private communication networks."

x.     "Always On.   Always There. With Improved Coverage. With a cellular architecture in place across the entire OpenSky network, high quality communication is maintained even in high traffic or remote areas."

y.     "Because the OpenSky radio network is a private, dedicated Intranet, rather than a public IP network, it ensures high quality and maximum voice packet clarity in all communications.  The OpenSky Internet Protocol backbone gives every OpenSky subscriber radio a unique IP-address for continuous connectivity to the network and, OpenSky is the first network to make Voice and Data Intranet technology available to private land mobile communications applications, such as public safety, fleet management and public utilities."

z.     "It delivers enhanced coverage for wide area applications with one integrated network, where two separate data and voice networks were needed in the past."

aa.   "Redundant system configurations ensure highly reliable communications."

bb.   "Always on.  Always There."

cc.   "[T]he Hardware and installation Services furnished by Seller under this Contract shall be free from defects in material and workmanship and shall conform the Contract specifications."

dd.   The radio system shall perform as follows: (i) there will be 95% coverage in the Las Vegas metropolitan area; and (ii) mobile voice coverage shall meet the DAQ 3.4 standard, defined as "speech understandable with repetition only rarely required.  Some noise/distortion."

ee.   "The Network Switching Server (NSS) is a fully integrated voice and data controller at the heart of the OpenSky/NetworkFirst/P25 packet-switched network.  Deployed in a Network Switching Center (NSC), it performs routing functions for digital trunked voice and packet data messages through an Internet Protocol (IP) backbone.  The NSS assures that voice and data messages are delivered only to those radio sites necessary to reach the destined mobile subscribers."

ff.   "The Centralized Network Manager provides users with powerful tools that facilitate effective management of OpenSky, NetworkFirst and/orP25 (Project 25) digital packet-switched network spanning multiple regions, each of which is managed by a Regional Network Manager."

gg.   "The Regional Network Manager provides users with powerful tools that facilitate effective management of OpenSky, NetworkFirst and/orP25 (Project 25) digital packet-switched network."

hh.   Switching between mobile radios (in-vehicle) and portable radios (on the officer) will take between 2 and 4 seconds.

26.   In M/A COM's Technical Compliance Matrix, a part of its proposal to LVMPD, MA/COM represented to LVMPD that its proposal constituted "Full Compliance" with LVMPD's requirements as stated in its Request for Proposal in the following categories:

**Summary Requirements**

a.   IP-based Architecture

b.   TDMA

c.   Packet Digital

d.   Trunked

e.   AES Encryption

f.   OTAR and Manual Encryption Keying

g.   OTAP All aspects of the radio personality can be programmed over the air

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

1        h.      Data and voice over the same infrastructure

2        i.      GPS Capability

3        j.      Interoperability

4        k.      Virtually unlimited talk groups

5        l.      Voice, data and control use common modulation technique to ensure

6        m.      Ability to easily fill problem areas

7        n.      Frequency plan must meet FCC and Region 27 Plan

8        o.      Frequencies must be licensable

9        p.      Frequency plan for the entire system

10       q.      Plot of the guaranteed coverage

11       **General Requirements**

12       r.      User ID

13       s.      In-Building Coverage

14       t.      Signal Quality

15       u.      Data Appendix B Section 1.8

16       v.      Computer Aided Dispatch (CAD)

17       w.      Consoles

18       x.      Base Stations/Repeaters

19       y.      Mountain Top Repeater Sites

20       z.      Antennas

21       aa.     Data Terminals

22       **System Functional Requirements**

23       bb.     Roaming and Handoff

24       cc.     Restriction of Talk Groups to Geographic Areas

25       dd.     Radio Disable (Selective Inhibit)

26       ee.     Caller Identification

27       ff.     System Access

28       gg.     Hard Patch

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

hh. Over-The-Air Programming (OTAP)

ii. Call Queuing

jj. Transmission and Message Trunking

kk. Ruthless Preemption

ll. Group Busy

mm. Dispatcher/Supervisor Override

nn. Individual Call

oo. Emergency Call & Alert

pp. Late Call Entry

qq. Talk-Around

**System Reliability and Fault Tolerance**

rr. Wide Area

ss. Channel Control

tt. System Controller

uu. Peripherals

**Equipment Requirements**

vv. High Power Repeater Sites

ww. Fixed Antenna Systems

xx. Wide Area Controller

yy. System Management

zz. Alarms

aaa. Network Topology Map

bbb. Audible Alert

ccc. Data Base Partitioning and System Security

ddd. System Administration

eee. Statistics

fff. Remote Diagnosis

ggg. Dispatch Consoles

**SANTORO WHITMIRE**

10001 Park Run Drive, Las Vegas, Nevada 89145

(702) 948-8771 – fax (702) 948-8773

1    hhh.    Backbone

2    **Implementation Requirements**

3    iii.    Engineering

4    jjj.    Engineering Documentation

5    kkk.    System Engineering

6    lll.    As-Built Documentation

7    **Testing and Cutover Requirements**

8    mmm.   Acceptance Test Plan

9    nnn.    Radio Coverage Acceptance

10   ooo.    Factory Acceptance test

11   ppp.    On-Site Acceptance Tests

12   qqq.    Operational Tests

13   rrr.    Operational Acceptance Test

14   sss.    Final Acceptance

15   ttt.    Uninterrupted Operation of Current System

16   uuu.    Interoperability

17   vvv.    Project Management

18   www.   Project Organization

19   xxx.    Site Management

20   yyy.    Installation

21   zzz.    Installation Plan

22   aaaa.   Maintenance

23   **Support Services Requirements**

24   bbbb.   Warranty

25   cccc.   Training

26   dddd.   Software Updates

27   eeee.   Spare Parts

28   ffff.    Test Equipment

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

gggg.   Documentation

27.    At all relevant times, M/A COM was promising and affirmatively representing that it would be delivering the latest and greatest radio system to LVMPD.

28.    As an additional part of its representations and inducement to have LVMPD purchase its radio system, M/A COM represented in is proposal that it had successfully constructed and installed radio systems in other jurisdictions, including, but not limited to, the Commonwealth of Pennsylvania, Florida Power and Light, Miami-Dade FL, Oakland County, MI, City of Milwaukee, WI, and the State of New York.

29.    Encouraging reliance on the references to M/A COM's work for other jurisdictions, M/A COM stated, "M/A COM's communications systems solutions have become accepted as the system of choice for transit, public safety, government, industrial, and utility applications, both domestically and internationally…Listed on the next few pages are samples of customer references that include a detailed description of these select M/A COM systems.  This sampling encompasses a broad range of communications system solutions that we have provided to our customers, and considering the variety of systems we have designed and implemented, we think you will recognize that M/A COM can provide a customized solution that is right for you."

30.    M/A COM further represented, "A Proven Record of Contract Performance – Our record of on-time and on-budget contract performance is head and shoulders above the others in the industry."

31.    M/A COM's proposal stated, "OpenSky is a fully interoperable digital communications solution for public safety, utility, federal, industrial, and transit markets. Some of our OpenSky customers and details about each of their systems are provided in Figure 1 below… PA, Cumberland, Lancaster, Oakland, Milwaukee, Central Arizona Project, State of New York."

32.    In its description of the radio system's coverage for the State of Florida, M/A COM stated that coverage was "98% mobile and selected 98% portable."

33.    In its description of the radio system's success for the City of Milwaukee, Wisconsin, M/A COM stated, "M/A COM is providing an integrated, law enforcement digital

voice and data network, city and countywide that will allow the Milwaukee Police Department to easily interoperate with other city and non-city agencies."

34.     In its description of the radio system's success for the Commonwealth of Pennsylvania, M/A COM stated, "M/A COM has successfully deployed all of the Regional Operations Centers and over 5,000 subscriber units.  System deployment is near complete in the southeast regions and there is substantial coverage throughout the remainder of the Commonwealth."

35.     Kansas City, Missouri was identified as an additional example of M/A COM's "communications system solutions."

36.     M/A COM described the following radio systems as being "on budget;" "SaskTel, Commonwealth of PA, Florida Power and Light, Miami Dade, FL."

37.     In October 2006, M/A COM provided a Customer Design Review for LVMPD whereby M/A COM further represented and promised, *inter alia*, the following:[5]

    a.    The Grade of Service shall be 99%--the likelihood that a radio call is queued for longer than one second is less than 1%.

    b.    "Fault tolerance is one of the major design objectives of OpenSky.  In critical situations, system reliability is of paramount importance.  OpenSky uses distributed processing architecture to provide unsurpassed fault tolerance."

    c.    "Failure of a local site does not affect the networking functions for the remaining sites.  Likewise, failures at the NSC do not affect the local trunking function at an RF site.  Such failures simply prevent the extension of the call to a wider geographic area."

    d.    "Sufficient overlap exists between sites such that the failure of a single site will have a relatively small impact on overall coverage."

    e.    "It is possible that a site failure will go unnoticed by the majority of the user community.  In the event that a user is operating within a building whose density approaches 17 dB and in a location where other sites do not provide sufficient signal to penetrate the building, then that user will experience loss of coverage if the serving site fails."

    f.    "The distributed processing architecture starts at the repeater, the heart of the OpenSky system.  Because of this, a high-degree of fault tolerance is already built into the system.  Each base station is equipped with a base station

---

[5] The October 2006 Customer Design Review for LVMPD is incorporated by reference as though its contents were fully stated herein.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

controller card in which all of the basic trunking logic is maintained.  This architecture allows continued trunked radio operations as failures occur, providing a robust 'graceful degradation.'"

    g.    "If a single base station is lost, the total capacity is reduced but the remaining channels can still support both voice and data.  The OpenSky integrated trunking system can intelligently, in a fault tolerant "graceful degradation" mode, respond to equipment failures and balance the voice and data load over the remaining base stations."

    h.    "These links have demonstrated reliability sufficient to support Public Safety communications…"

    i.    "The main benefit from splitting the primary and backup NSC equipment is that the system can be safeguarded from a catastrophic power or communications failure at either the primary or the backup facility."

38.    After M/A COM submitted its proposal, authorization was provided to allow negotiations to occur with M/A COM for a new radio system that would support, among other things, all voice and low speed data communications for LVMPD's users.

**Impressed With M/A COM's Proposal, LVMPD Contracts for M/A COM's Radio System (And the Subsequent Assignment to Harris)**

39.    LVMPD relied upon the representations made by M/A COM in its proposal and other written materials prepared for LVMPD.

40.    A contract between M/A COM and LVMPD was ostensibly entered into in 2006 pertaining to a radio system infrastructure.  Attached hereto as Exhibit 2 is a true and correct copy of the contract that was entered into, excluding exhibits, which specifically incorporated M/A COM's proposal.[6]

41.    In 2009, an assignment occurred between M/A COM to Harris whereby Harris assumed all of M/A COM's duties and/or other obligations.

**The Construction and Attempted Implementation of the Radio System Has Taken Years to Accomplish**

42.    It took several years for the radio system infrastructure to be built.  Among other things, towers had to be constructed at various remote sites in or about the Las Vegas Valley.

43.    In addition to entering into a contract pertaining to the radio system infrastructure, which was to serve as the back-bone for LVMPD's communication system, LVMPD agreed to

---

[6] The exhibits to the contract are voluminous and may contain technical and proprietary information.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

1   purchase thousands of mobile and hand-held radios for use by officers in the field.  Most of the

2   radios were purchased from Harris.

3        44.     LVMPD has expended tens of millions of dollars associated with the radio

4   infrastructure system and radios.

5        45.     LVMPD also ostensibly entered into a contract with Harris for the purchase of

6   new radio dispatch consoles and a recording system to, among other things, facilitate

7   communications between LVMPD's dispatch and police officers in the field.[7]

8        46.     Over $3 million was committed with respect to the consoles and recording

9   system.

10       47.     Several million dollars have also been spent with respect to ancillary software and

11  maintenance agreements with Defendants.

12       48.     Testing has occurred at various times with respect to the radio system

13  infrastructure, radios, console and recording system.

14       **M/A COM Sold LVMPD a "Bill of Goods"—the Radio System is a Disaster**

15       49.     From the outset, M/A COM could not deliver on the promises it made to

16  LVMPD.

17       50.     It took several years, not fourteen months, to construct and install the radio

18  system.

19       51.     Once constructed, extensive problems have been encountered with respect to the

20  radio system infrastructure, radios, consoles and/or the recording system.

21       52.     Defendants have been informed of the problems.

22       53.     Harris is fully aware of, and has acknowledged the problems and has been given

23  multiple opportunities to rectify the problems.

24       54.     Harris has made repeated attempts to address the problems over a prolonged

25  period of time.

26

27  [7] Harris selected and sub-contracted with a third-party, Exacom, to supply a portion of the system;
namely, the recording system.  The terms of the contract make M/A COM and/or Harris liable for

28  Exacom's deficiencies.

55.     LVMPD's reports of problems have been met with repeated assurances by Harris that the problems would be rectified.

56.     Harris has repeatedly assured LVMPD that the radio system infrastructure, radios, consoles and recording system would ultimately be able to perform as originally expected.

57.     LVMPD has afforded Harris reasonable opportunities to cure the problems associated with the radio system.

58.     LVMPD has reasonably waited for the Harris to rectify the problems.

59.     LVMPD's testing and use of the radio systems, radios, consoles and recording system have been premised on Defendants' unsuccessful attempts at repair and repeated assurances that the entire system would ultimately perform as expected.

60.     The problems have been so pervasive that final testing and acceptance of the communication system has not occurred.

61.     Pursuant to the contract, final acceptance is conditioned on satisfactory performance of the radio system over a prolonged time-period.

62.     As such, LVMPD has not yet accepted the radio system infrastructure, radios, consoles and/or recording system.

63.     To the extent that acceptance could be deemed to have occurred, LVMPD has revoked its acceptance.

64.     Defendants' have substantially failed to fulfill their obligations through no fault of LVMPD by, among other things, failing to deliver and implement a fully functioning communication system to LVMPD.  The failings of the radio system have been documented by hundreds of officer complaints.

65.     The following is a non-exhaustive list of the failings of the radio system:

    a.     Many radio communications are garbled and/or inaudible.

    b.     Officers frequently experience difficulty and/or the inability to make radio calls.

    c.     The time to switch between mobile radios and portable radios exceeds the 2-4 second range promised by Defendants.

    d.     Many data transmissions suffer from extended delays.

    e.     Many radio communications are not being received by the intended recipient.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

f.    Many radio communications are being sent to unintended recipients.

g.    Officers are frequently being improperly denied the ability to transmit.

h.    One of the hard drives supporting the radio system's ability to record communications has completely failed, rendering all of the data stored therein inaccessible.

i.    Total radio failure has been experienced multiple times.

j.    Radio system failure has been experienced during multiple crisis situations.

### LVMPD—A Victim of Both an Inoperable Radio System and Fraud

66.    Not only did M/A COM overpromise and under deliver, but it did so fraudulently.[8]

67.    The misrepresentations were false when they were made and they are false today (alternatively, there was no basis to make the representations).[9]  The failings of the radio system demonstrate the falsity of the representations made by Defendants (some of which are included in Paragraphs 15 through 39).

68.    Among other things, Defendants misrepresented:

a.    That the radio system fully complied with the requirements as stated in the Technical Compliance Matrix;

b.    That the radio system would provide 95% coverage in the Metropolitan Area;

c.    That the radio system would be reliable and that less than 1% of the calls would be queued for more than 1 second;

d.    That "switching between mobile radios (in-vehicle) and portable radios (on the officer) will take between 2 and 4 seconds;"

e.    That the construction and installation of the radio system would take 14 months;

f.    That the radio system would "accomplish the mission;"

g.    That the radio system was the "most cost-effective solution for private communication networks;"

h.    That the radio system would, "provide the maximum degree of coverage with minimal impact and construction required;"

---

[8] *See* Joe Schoenmann, "Radio Troubles Prompt Metro to Double Up Officers in Patrol Cars," *Las Vegas Sun*,    7/3/2014,    http://www.lasvegassun.com/news/2014/jul/03/radio-troubles-prompt-metro-double-officers-patrol/ (date accessed: 7/28/2014).

[9] *See Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992) (holding that a party makes a fraudulent statement when he/she "either [1] knowingly made false representations, or (2) lacked sufficient basis for making the representations.").

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8871 – fax (702) 948-8773

i.      That the radio system "provides LVMPD…Fault tolerant design to protect against the worst case scenario;"

j.      That the radio system is "robust under heavy load…"

k.      That the radio system provides "efficient support of both long messages… and short messages…"

l.      That with the radio system "all talk groups can be simultaneously active and the system will not queue;"

m.      That the technical risk, the schedule risk, the cost risk, and the developmental risk of the radio system were "minimal;"

n.      That the radio system was "easy to self-maintain;"

o.      That the radio system "ensures high quality and maximum voice packet clarity in all communications;"

p.      That "OpenSky voice and data system will meet the budget and operations and schedule specifications set forth in this Request for Proposal;"

q.      That the radio system represents "the least possible risk to LVMPD and the citizens of Clark County;"

r.      That the radio system "delivers enhanced coverage for wide area applications;"

s.      That with the radio system "high quality communication is maintained even in high traffic or remote areas;"

t.      That the radio system's "redundant system configurations ensure highly reliable communications;"

u.      That the radio system "furnished by Seller under this Contract shall be free from defects in material and workmanship and shall conform the Contract specifications;"

v.      That the radio system's "mobile voice coverage shall meet the DAQ 3.4 standard, defined as 'speech understandable with repetition only rarely required.  Some noise/distortion.'"

w.      That the radio system ensured "that voice and data messages are delivered only to those radio sites necessary to reach the destined mobile subscribers;"

x.      That the radio system provides "unsurpassed fault tolerance;"

y.      That the radio system is reliable and durable—"failure of a local site does not affect the networking functions for the remaining sites;"

z.      That the radio system is reliable and durable—"sufficient overlap exists between sites such that the failure of a single site will have a relatively small impact on overall coverage;"

aa.      That the radio system is reliable and durable—its architecture "allows continued trunked radio operations as failures occur, providing a robust 'graceful degradation.'"

bb.      That the radio system is reliable and durable—"if a single base station is lost,

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8871 – fax (702) 948-8773

the total capacity is reduced but the remaining channels can still support both voice and data;"

cc.    That the radio system has "demonstrated reliability sufficient to support Public Safety communications;" and

dd.    That "the [radio] system can be safeguarded from a catastrophic power or communications failure at either the primary or the backup facility."

69.    The following chart further contrasts what was promised to LVMPD, and what LVMPD actually received:

| WHAT WAS FALSELY PROMISED | WHAT ACTUALLY HAPPENED |
| --- | --- |
| Reliability. | Not Reliable. |
| Maintainability. | Not maintainable. |
| Interoperability and "elegant interoperability solutions." | No Interoperability and lack of elegance. |
| Innovation. | Not innovative. |
| Non-obsolescence. | Obsolescence already. |
| Am I buying serial number one? | Seems like it. |
| Am I sure that I know the ultimate cost? | Cost has been a runaway train. |
| Will this new system meet the Department's needs now and into the future? | No and no. |
| NO SURPRISES pushing the project "out of bounds." | Project has been full of SURPRISES and the project has been pushed way out of bounds. |
| Capabilities. | Poor capabilities. |
| Fault tolerance and robust system. | Too many faults and lack of robust system. |
| Choices. | Lack of Choices. |
| System that would meet and exceed the needs of LVMPD | System that does not meet the needs of LVMPD, and which certainly has not exceeded its needs. |

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

| "Unmatched 'time of crisis' capabilities." | Inoperable systems during times of crisis. |
|---|---|
| It's one thing to have our (M/A-Com) representative tell us how wonderful our system is …. It's another thing entirely to see the system live up to its reputation in an emergency. | It's one thing to have our (M/A-Com) representative tell us how wonderful our system is …. It's another thing entirely to see the system [completely fail to] live up to its reputation in an emergency. |

70.     In addition to the misrepresentations made concerning the technical capabilities of the radio system, several material misrepresentations and/or omissions were made concerning the experience of other jurisdictions with the OpenSky radio system.

71.     Despite the claim that "OpenSky is a fully interoperable digital communications solution" for the City of Milwaukee, the truth is that the Milwaukee system was over budget and has been "plagued with glitches."[10]  Indeed, during the first five months of 2010, hundreds of radio trouble reports were submitted to the Milwaukee Police Department complaining about radio failure.  These facts were never communicated to LVMPD.

72.     Despite the claim that "OpenSky is a fully interoperable digital communications solution" for the Commonwealth of Pennsylvania and that the system is "on budget," the truth is that the Pennsylvania system was over budget and had experienced "2,000 system outages."  Specifically, the contract price was $179 million when approved and the cost as of 2012 was $368 million.[11]   These facts were never communicated to LVMPD.   Recently, the Commonwealth of Pennsylvania announced that due to ongoing problems faced by state police and other users, OpenSky is being replaced.

73.     Despite the claim that "OpenSky is a fully interoperable digital communications solution" for the State of New York, the truth is that the New York system was a total failure.  In

---

[10] Don Walker, "Final Tally for OpenSky: Nearly $23 Million," *Milwaukee Journal Sentinel*, 2/27/2014 http://www.jsonline.com/blogs/news/247354901.html (date accessed: 7/21/2014).

[11] Jan Murphy, "Senators Grill Company Over Problems with Statewide Radio Network," *The Patriot News*,                                                                                           5/23/2012 http://www.pennlive.com/midstate/index.ssf/2012/05/senators_grill_company_over_pr.html        (dated accessed: 7/21/2014).

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE

10001 Park Run Drive, Las Vegas, Nevada 89145

(702) 948-8771 – fax (702) 948-8773

2009, the State of New York Office of Information Technology Services issued a statement that M/A COM "failed to deliver a satisfactory and acceptable public safety communications network and is in default of the contract."[12]  The State terminated its contract with M/A COM in 2009. These facts were never communicated to LVMPD.

74.     Despite the claim that "OpenSky is a fully interoperable digital communications solution" for Lancaster County, the truth is that the Lancaster County system was a disaster. Work on the system "progressed slowly" and "OpenSky, project managers found problems with the way the system operated."[13]  The County terminated its contract for Open Sky in March 2008.  These facts were never communicated to LVMPD.

75.     Despite the claim that "OpenSky is a fully interoperable digital communications solution" for Cumberland County, the truth is that the Cumberland County system had significant dead zones, garnering 600 complaints in 1 year.[14]  These facts were never communicated to LVMPD.

76.     Out of the seven contracts identified in the Proposal as an example of OpenSky as a "communications system solution," five had significant problems.  Two even cancelled the contract for OpenSky.  None of this information was communicated to LVMPD by Defendants.

77.     Despite the claim that the system provided for the State of Florida was successful and provided coverage for "98% mobile and selected 98% portable," an internal review found that the system "does not meet [the] state law enforcement agency's needs when officers leave their vehicles."[15]

---

[12] Office of Information Technology Services, "Office for Technology Finds M/A COM in Violation of Statewide Wireless Network Contract," 1/15/2009, http://www.its.ny.gov/press/News/PressRelease_SIPOContract.htm (dated accessed 7/21/2014).

[13] Helen Coldwell Adams, "County Radio: Over, & Out," *LancasterOnline*, 7/12/2009, http://lancasteronline.com/news/county-radio-over-out/article_362990dc-02ba-5b48-ad7b-f6f2171f4df7.html (date accessed: 7/21/2-14).

[14] Dan Miller, "Cumberland County Workers Debate Shortcomings of Emergency Radio System," *The Patriot News*, 6/2/2012, http://www.pennlive.com/midstate/index.ssf/2012/06/cumberland_county_workers_deba.html (date accessed: 7/21/2014).

[15] Joint Task Force on State Agency Law Enforcement Communications – Report on the Statewide Law Enforcement Radio Systems (SLERS) 4/8/2011,

78.   Despite the claim that the system provided for Kansas City, Missouri was successful, the system was characterized as a "lemon" by officials who refused to put up with the "same problems experience by the last 'new system,'" when the system was being replaced.[16]

79.   Not only are these examples demonstrative of the continued failure of the M/A COM/Harris radio systems, the dates of these reports implicate Defendants and whether or not they were candid with LVMPD when such bold promises about its proposed new radio system were made.  At minimum, M/A COM/Harris failed to communicate any change in circumstances with the examples used in its proposal to demonstrate a history of success of M/A COM/Harris' OpenSky radio system.  At maximum, there was no "change in circumstances," and M/A COM/Harris knew that there were problems with its radio systems cited in the proposal and flat out lied about the facts.  Either way, M/A COM/Harris were not, and have not been, forthright and candid with LVMPD, a duty that was assumed from the moment a response was provided to LVMPD's Request for Proposal.

80.   In addition to knowing that they could not deliver a functioning OpenSky radio system, M/A COM/Harris' experience prior to contracting with LVMPD demonstrates that they knew that they could not deliver the system within the 14 month timetable.  Every OpenSky contract for over 1,000 users took at least three years to complete.  Specifically, Milwaukee took approximately three years to complete.  Oakland County took approximately four years to complete.  Cumberland County took six years to complete.

81.   Defendants' experience with OpenSky in other jurisdictions besides those advertised in the proposal demonstrates its failures.  For example, in 2011, in Steuben County, Indiana, the sheriff, fire chief, and other public safety officials signed a letter of no confidence in the OpenSky radio system.  Likewise, in 2005 the Sacramento Municipal Utility District ("SMUD") contracted for the OpenSky radio system.  However, because OpenSky was not

───────────────

(continued)
http://www.flhsmv.gov/LECTaskForce/SLERS081512.pdf (date accessed: 7/21/2014).

[16] "Kansas City Radios Need to Be Replaced," KMBC.com, 1/29/2009, http://blog.tcomeng.com/wp-content/uploads/2008/12/kansas_city_mo_radios_need_to_be_replaced-01292009.pdf (date accessed: 7/21/2014).

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

sufficiently reliable, SMUD did not accept the radio system.

**LVMPD Has Been Left With No Choice But to Replace the System**
**That Was Supposed to Last for Years, and It Has Sustained Massive Damages**

82.     The communication system sold by Defendants is effectively useless as a result of the breaches by Defendants.

83.     Given the frequency and magnitude of the problems, LVMPD has been forced to seek an alternative vendor which is capable of providing a fully functioning communication system to LVMPD.

84.     LVMPD has sustained and/or will likely continue to sustain damages as a result of the non-conforming systems delivered by Defendants.[17]

85.     In connection with the lack of acceptance and/or revocation of acceptance, LVMPD is entitled to a return of all monies expended in connection with the purchase of the radio system infrastructure, radios, consoles and/or recording system.[18]

86.     To the extent any contract and/or warranties are determined to be in existence, Defendants have materially breached the terms of the contract and/or warranties by, among other things, failing to deliver to LVMPD a properly functioning communication system, including but not limited to the radio system infrastructure, radios, consoles and recording system.

87.     Defendants have contractually breached the implied covenant of good faith and fair dealing that exists in every contract in Nevada by, among other things, failing to deliver to LVMPD a properly functioning communication system within the spirit of the parties' agreements.

88.     LVMPD has fully performed its obligations under all agreements.

89.     LVMPD paid Defendants millions of dollars for a fully functioning radio

---

[17]  To the extent NRS Chapter 104 may apply in this matter, potentially applicable provisions include, but are not limited to, NRS 104.2711, NRS 104.2712, NRS 104.2713, NRS 104.2714, NRS 104.2715, NRS 104.2717, NRS 104.2721, NRS 104.2601, NRS 104.2606, NRS 104.2607, NRS 104.2608, NRS 104.2609, NRS 104.2313, NRS 104.2314, NRS 104.2315.

[18]  In the event NRS Chapter 104 is deemed to apply, revocation of acceptance is pursuant to NRS 104.2608.  *Accord, Sierra Diesel Injection Service v. Burroughs Corporation, Inc.*, 651 F. Supp. 1371 (D. Nev. 1987).

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

communication system.

90.     Defendants have accepted millions of dollars, but, to date, have failed to provide a fully functioning radio communication system.

91.     Defendants had a pecuniary interest in connection with the sale of the radio communication system.

92.     In connection with the sale of the radio communication system to LVMPD, Defendants provided false information to LVMPD for its guidance in business transactions.

93.     LVMPD justifiably relied upon the false information supplied by Defendants.

94.     Defendants, by their words and actions, made representations of facts and circumstances that were not true and which misled LVMPD.

95.     Defendants intended to induce Plaintiff to act or to refrain from acting in reliance upon the misrepresentations.

96.     As compared to LVMPD, Defendants were aware of material facts peculiarly within their knowledge.

97.     LVMPD is not, at this time and without appropriate time to conduct discovery, in possession of the necessary documents which will show Defendants' degree of knowledge concerning the false statements.  Those materials are peculiarly within the possession and control of Defendants.[19]

98.     LVMPD actually and justifiably relied on Defendants' misrepresentation and/or failure to disclose the true facts concerning the pertinent transaction(s).

99.     Had LVMPD been aware of the true facts, it would have acted differently.

### FIRST CLAIM FOR RELIEF
### (Fraud – Against all Defendants)

100.     LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 99 as though fully set forth herein.

---

[19]   Courts have recognized relaxed pleading standard where information is in the hands of the defendant and where discovery has not occurred.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987); *Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993); *Rocker v. KPMG, LLP*, 122 Nev. 1185, 148 P.3d 703 (2006); *Gould v. Marlon*, 1987 U.S. Dist. Lexis 16878 (D. Nev. 1987) (the Hon. Lloyd D. George denying motion to dismiss and applying relaxed pleading standard).

101.    Defendants were selling a highly technical and sophisticated radio system that not only was going to cost millions of dollars, but which also implicated, among other things, public safety issues.  The radio system was integral to not only police officer safety, but also to the safety of the public at large.  In addition, the radio system implicated residents of Clark County, Nevada, whose tax payer dollars were ultimately spent on the radio system.

102.    As compared to LVMPD, Defendants were (and still are) aware of material facts peculiarly within their knowledge.[20]

103.    Defendants knew that its relationship with LVMPD was going to span a number of years.

104.    The following graph (Figure 1) depicts LVMPD's expenditures from the execution of the initial radio system contract in January 2006 through LVMPD's decision to move on from the OpenSky radio system in October 2012:

**Figure 1**



105.    Figure 1 illustrates the amounts spent by LVMPD for the radio system between

_____

[20] Accordingly, a heightened pleading standard should not apply as discussed elsewhere in this complaint.

**SANTORO WHITMIRE**
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

2006 and 2015.  As shown in Figure 1, LVMPD spent approximately $9 million in connection with the radio system infrastructure (the backbone including the towers, etc.).  LVMPD then spent approximately $24 million buying radios and associated equipment for the radio system in or around 2008-09.[21]  LVMPD later spent approximately $5 million dollars more in connection with new radio consoles and maintenance related items in or around 2011.  In total, LVMPD has spent in excess of $40 million in connection with Defendants' radio system.

106.  Defendants had various duties throughout the course of their dealings with LVMPD including, but not limited to:

        a.  a duty not to make false representations;[22]

        b.  a duty not to make representations when Defendants lacked sufficient basis for making the representations;[23]

        c.  a duty to supply complete and correct information to LVMPD;[24]

        d.  a duty not to make misleading statements by partially suppressing or concealing information;[25]

        e.  a duty to disclose where, as here, there exists material facts peculiarly within the knowledge of Defendants and not within the fair and reasonable reach of

---

[21] LVMPD began to purchase the radios and other accompanying hardware from Defendants in or about November 2008.  The bulk of these purchases were not made until June 2009, when LVMPD made payment for over $13 million of radios purchased from Defendants.

[22] *See Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992) (holding that a party makes a fraudulent statement when he/she "either [1] knowingly made false representations, or (2) lacked sufficient basis for making the representations.").

[23] *Id.*

[24] *See Nevada Nat'l Bank v. Gold Star Meat Co.*, 89 Nev. 427, 430, 514 P.2d 651, 653 (1973) ("Where one responds to an inquiry, it is his duty to impart correct information"); *Rosenthal v. Poster*, No. 2:07-CV-1204, 2008 U.S. Dist. LEXIS 87244, at *5 (D. Nev. Sept. 29, 2008) ("A party is bound in good faith to disclose and impart correct information, if a party voluntarily responds to an inquiry."); *Midwest Supply v. Waters*, 89 Nev. 210, 212-13, 510 P.2d 876, 878 (1973) ("The suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist.").

[25] *See*, e.g. *Epperson v. Roloff*, 102 Nev. 206, 719 P.2d 799 (1986) ("[W]e also note that a defendant may be found liable for misrepresentation even when the defendant does not make an express misrepresentation, but instead makes a representation which is misleading because it partially suppresses or conceals information.").

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

LVMPD;[26]

    f.  a duty to disclose, in the course of their business or occupation, material facts in connection with the sale or lease of goods or services;[27]

    g.  a duty to disclose matters known to them that they know to be necessary to prevent their partial or ambiguous statement of the facts from being misleading;[28]

    h.  a duty to disclose subsequently acquired information that they know will make untrue or misleading a previous representation that when made was true or believed to be so;[29]

    i.  a duty to disclose the falsity of a representation not made with the expectation that it would be acted upon, if they subsequently learn that the other is about to act in reliance upon it in a transaction with them;[30] and,

    j.  a duty to disclose facts that were basic to the transaction between the parties.[31]

107. Over the course of the parties' ongoing relationship, Defendants had a duty to be accurate and truthful with LVMPD about what they knew about the radio system they were selling to LVMPD.

108. Defendants' intended to induce LVMPD to spend millions of dollars in connection with the radio system.

---

[26] *See, e.g., Villalon v. Bowen*, 70 Nev. 456, 467-68, 273 P.2d 409, 415 (1954); *Epperson v. Roloff*, 102 Nev. 206, 719 P.2d 799, 803-04 (1986) ("At least implicitly, they argue that an action in deceit will not lie for nondisclosure. This has, indeed, been described as the general rule. *See discussion,* W. Prosser, *supra,* §106, at 695-97. An exception to the rule exists, however, where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. Under such circumstances, there is a duty of disclosure.).

[27] *See* NRS 598.0923(2).

[28] *See,* Restatement (Second) of Torts § 551, which the Nevada Supreme Court recently cited and applied in a decision that was issued one day before Plaintiffs filed a Response to Defendants' Motion to Dismiss. *See Guilfoyle v. Olde Monmouth Stock Transfer Co.,* 335 P.3d 190, 198, 130 Nev. Adv. Op. 78 (2014); *accord, In re Agribiotech, Inc.,* 291 F. Supp. 2d 1186, 1191 (D. Nev. 2003) (citing § 551 and stating, "Nevada generally has adopted the Restatement in developing its common law governing deceit torts").

[29] *Id.*

[30] *Id.*

[31] *Id.*

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

109.    In 2005, before Defendants submitted the proposal to LVMPD, representatives of Defendants stated in internal emails that selling LVMPD the OpenSky radio system is a "must win."

110.    At all relevant times, Defendants knew their representations were false and/or had an insufficient basis of information for making the representations to LVMPD.  From the time that Defendants submitted their response to the RFP to the time that the parties' relationship ceased, Defendants knowingly made false representations and/or made representations with reckless disregard as to their truth or falsity.[32]  In addition, Defendants failed to correct prior representations and/or concealed information from LVMPD.

111.    Before an agreement was even signed, Defendants made numerous false representations regarding their system.  While LVMPD refers to all of the above allegations to support this claim for relief, LVMPD particularly refers to the false representations described in Paragraphs 15-38, 50-81.

112.    Defendants continued to make misrepresentations and/or concealed material matters over the time that LVMPD was spending millions of dollars in connection with the radio system. In other words, Defendants continued to perpetuate its previous misstatements (knowingly made and/or made with insufficient basis); they continued to perpetuate half-truths; and they continued to misrepresent material facts that went to the basis of the radio system—all so that LVMPD would continue transacting with Defendants and paying them money.

113.    This occurred even after Defendants continued to gain additional knowledge that its system did not work and before LVMPD spent additional funds in connection with the system.

114.    For example, Defendants continued to represent that the radio system they sold to LVMPD would function properly, despite knowing from their experience with New York (and other jurisdictions) that the OpenSky system did not work.[33]

_____

[32] *See Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992) (holding that a party makes a fraudulent statement when he/she "either [1] knowingly made false representations, or (2) lacked sufficient basis for making the representations.").

[33] LVMPD refers to M/A COM's experience with the State of New York (as well as other jurisdictions)

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

115.   Even after Defendants knew about the failed tests in New York in 2007 and 2008, M/A COM/Harris never communicated these failures to LVMPD.[34]

116.   Had Defendants disclosed what they knew about the radio system—that it could not perform as represented—LVMPD would have been able to save the tens of millions of dollars spent on radios that were later purchased in 2008 and 2009.

117.   Instead, Defendants continued to mislead LVMPD about the qualities of the radio system, resulting in the expenditure of substantial monies.

118.   Similarly, Defendants stated in its proposal that "OpenSky is a fully interoperable

_____ (continued)

as additional evidence that it knew that the radio system did not work as advertised. However M/A COM never communicated the problems it had with the New York system to LVMPD. From the reports of the New York System:

> The OFT said M/A-COM failed to cure 15 of 19 deficiencies that were outlined in an Aug. 29, 2008, default letter. Problems outlined in the default notice included high failure rates for mobile radios and other portable devices; multiple site outages that rendered the network unavailable for 43 hours during the July test period; and glitches with the network's uninterrupted roaming feature that in some cases prevented the use of radios for emergency communications. According to the notice, the wireless network failed two earlier tests -- one in fall 2007 and another in spring 2008 -- before another unsuccessful assessment in July 2008.
>
> ***
>
> Angela Liotta, the acting media relations director of the OFT, told Government Technology that during the most recent testing period in November 2008, the network had 14.5 cumulative hours of downtime for the month, which is well above the U.S. standard of only 52.6 minutes per year. In addition, she said 29 percent of the mobile and portable radios were malfunctioning, which is well above the maximum 3 percent failure rate of a typical consumer product.

Matt Williams, "New York State Cancels Wireless Network Contract," Digital Communities, 1/15/2009, http://www.digitalcommunities.com/articles/New-York-State-Cancels-Wireless-Network.html (date accessed 7/26/2014).

[34] In addition to affirmatively misrepresenting the quality and nature of the radio system, Defendants failed to correct statements made to LVMPD. For example, Defendants stated in the proposal "the State of New York chose M/A-Com as the radio communication manufacture of choice for the new OpenSky/P25 statewide system." However, the State of New York terminated its contract for OpenSky in 2008. Defendants concealed the issue/did not correct the statements made in the proposal despite having a duty to do so. *Villalon*, 70 Nev. at 467-68 ("[T]he general rule is that a deliberate failure to correct an apparent misapprehension or delusion may constitute fraud. This would appear to be particularly so where the false impression deliberately has been created by the party sought to be charged"); *see also* Restatement (Second) of Torts § 551(2)(c).

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

digital communications solution" for Lancaster County, Pennsylvania. However, OpenSky's failures were so significant that Lancaster County cancelled its contract for OpenSky in March 2008.

119.   Defendants did not correct the statements made in the proposal despite having a duty to do so. Defendants could have done so before LVMPD purchased tens of millions of dollars of radios in 2009.[35]

120.   Further, Defendants initially tested the radio hardware that was ordered by LVMPD in 2008/2009 and those tests revealed failure rates between 30% and 50% (depending on the test).

121.   These failure rates for new radios were not communicated to LVMPD in April 2009 when Defendants learned of these errors, and before LVMPD would spend over $13 million on radio equipment over the following two months.

122.   Internal records from the Defendants identify several "critical issues" with the radio system in April 2010 (before installation of the system was even complete).[36]

123.   These issues include, but are not limited to, "████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████,"[37]

124.   Defendants did not properly disclose to LVMPD these results of Defendants' internal review before yet additional purchases were made.

125.   LVMPD has also learned through discovery that in August 2010, representatives

_____

[35] These are just two examples of when Defendants blatantly failed to correct a representation that turned out to be false before LVMPD purchased the radios and associated hardware from Defendants. Upon information and belief (based upon the materials produced in discovery) there are more.

[36] Even before the April 2010 internal review, Defendants knew that the products they sold LVMPD were faulty. Internal documents from Defendants reveal that they shipped the radios to LVMPD knowing that the software would be "██████████████████"

[37] The identification of these problems in April 2010 is particularly troubling not only because they were not resolved before LVMPD formally moved on from this radio system in October 2012, but because they contradict the express promises made by Defendants as early as 2005. For example, in Defendants' own proposal, they promised initial capacity for 12,000 users, double the 6,000 number that was causing problems in 2010.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

of Defendants admitted that the radio system was not sufficiently tested, stating, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"

(emphasis added).   Referring to this same problem, another Harris representative stated, "████████████████████████████████████████████████████████████████████████████████████"[38] (emphasis added).

126.   Defendants never told LVMPD that the problems facing the radio system were a result of a design flaw.

127.   Instead of making these disclosures, Defendants continued to represent that its system worked and that any problems that were being encountered would be cured.   Several representatives from Defendants including, but not limited to Rick Rodriguez, Martin Durham, and James Ramsay, continued to represent to LVMPD that the problems facing the radio system could and would be fixed.   Such representations were made when testing and cutover began in approximately 2010 virtually up until the time that LVMPD made the decision to purchase a new system.

128.   Years after getting LVMPD to sign up for their radio system and buy their radios, Defendants still intended to get LVMPD to enter into additional maintenance contracts.

129.   After recognizing that they were losing money on the radio system project for LVMPD,[39] in May 2011, Defendants' representatives stated that "[m]y recommendation is we want to close the books on Desert Sky[40] ████████████████████████████████████████ ██████████████████████" (emphasis added).

130.   In addition, the limited discovery conducted to date reveals that as late as August 2012, Defendants would do whatever it would take to get LVMPD to spend more money in connection with the project.   An internal e-mail states, "█████████████████████████████

---

[38] Discovery is underway and has revealed that Defendants knew much more about the problems with the radio system than what was disclosed to LVMPD.

[39] According to internal documents from the Defendants, the project was "in a loss position" at least as of July 2010.

[40] The OpenSky radio system was renamed Desert Sky.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

- 34 -

███████████████████████████████████████████████████ "

131.   The exact timing and extent of Defendants' knowledge of the falsity of the misrepresentations is particularly within the Defendants' knowledge.[41]  In the limited discovery conducted to date, Defendants have selectively redacted <u>significant amounts of information</u> referring to the failures of Defendants' systems in other jurisdictions.  Such redactions impair Plaintiff's ability to demonstrate Defendants' knowledge, state of mind and timing of knowledge regarding the failures of their system.

132.   Defendants intended to induce Plaintiff to act or to refrain from acting in reliance upon the misrepresentations.  Alternatively, Defendants intended to suppress the true facts with the intent to defraud Plaintiff.

133.   Plaintiff actually and justifiably relied on Defendants' misrepresentation and/or failure to disclose the true facts concerning the pertinent transaction(s).

134.   As a direct and proximate result of Defendants' fraud, LVMPD has been damaged.

135.   Defendants have acted with fraud, oppression, and/or malice and thus LVMPD is entitled to an award of punitive damages.

136.   Pursuant to NRS 41.600, Plaintiff is entitled to reasonable attorney's fees and other enhanced relief as Defendants have knowingly made false or otherwise actionable representations in the transaction with  LVMPD (as defined by NRS 598.0915).

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Against all Defendants)

137.   LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 136 as though fully set forth herein.[42]

138.   LVMPD and Defendants entered into a contract whereby LVPMD agreed to pay

---

[41]  Accordingly, a heightened pleading standard does not apply in this case.

[42]  As previously noted, to the extent NRS Chapter 104 may apply in this matter, applicable provisions may include, but not be limited to, NRS 104.2711, NRS 104.2712, NRS 104.2713, NRS 104.2714, NRS 104.2715, NRS 104.2717, NRS 104.2721, NRS 104.2601, NRS 104.2606, NRS 104.2607, NRS 104.2608, NRS 104.2609, NRS 104.2313, NRS 104.2314, NRS 104.2315.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

Defendants in exchange for Defendants agreeing to construct and install a radio system for LVMPD as described in the Request for Proposal, the Response to the Request for Proposal.

139.  LVMPD fully performed and discharged its obligations under the contract with Defendants and paid them as appropriate.

140.  Defendants breached the contract with LVMPD by failing to perform their duties and responsibilities under the contract.  Defendants have not constructed and installed a functioning radio system as they were obligated to do under the contract.

141.  Defendants failed to satisfy the express warranties concerning the functionality of the radio system it sold to LVMPD.

142.  Defendants failed to satisfy the implied warranty of merchantability as the radio system that was sold to LVMPD was not fit for ordinary use.

143.  Defendants failed to satisfy the implied warranty of fitness for a particular purpose as the radio system that was sold to LVMPD was not fit to be used and/or relied upon by a metropolitan police department such as LVMPD.[43]

144.  Any attempt to waive any warranty, implied or express, was ineffective and/or otherwise invalid.

145.  Defendants' actions and omissions constitute a material breach of the contract. Without a functioning radio system, the contract serves no purpose.

146.  As a direct and proximate result of Defendant's breach of contract, LVMPD has been damaged in a sum in excess of $10,000.00.

**THIRD CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against all Defendants)**

147.  LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 146 as though fully set forth herein.

---

[43] LVMPD understands that the Court dismissed the breach of implied warranties claims/allegations with prejudice.  In order to avoid waiving its right to appeal the matter, or to revive the claims/allegations if there is a change in the law, LVMPD repleads the allegations, but with a strikethrough in acknowledgment of the dismissal.

148.     LVMPD and Defendants entered into a contract whereby LVPMD agreed to pay Defendants in exchange for Defendants agreeing to construct and install a radio system for LVMPD as described in the Request for Proposal, the Response to the Request for Proposal.

149.     Every contract imposes upon the contracting parties a duty of good faith and fair dealing.

150.     LVMPD fully performed and, in good faith, discharged its obligations under the contract with Defendants and paid them as appropriate.

151.     Defendants owed LVMPD a duty to perform the services as promised to be performed in a manner which was faithful to the purpose of the contract.  Defendants breached that duty.

152.     In dealing with the acts alleged herein, Defendants failed to act in good faith and to the best of their ability, thereby breaching their duty to so conduct themselves and denying LVMPD its justified expectations.

153.     Defendants breached the spirit of the parties' contract; even they literally complied with certain terms/duties.

154.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, LVMPD has been damaged in a sum in excess of $10,000.00.

<h3 style="text-align:center">~~FOURTH CLAIM FOR RELIEF[44]~~</h3>
~~(Declaratory Judgment – Against all Defendants)~~

~~155.     LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 154 as though fully set forth herein.~~

~~156.     A justiciable controversy exists between LVMPD and Defendants.~~

~~157.     LVMPD has a legally protectable interest in this action.~~

~~158.     The controversy between LVMPD and Defendants is ripe for judicial determination.~~

---

[44]  LVMPD understands that the Court dismissed the declaratory judgment claim as the declaratory judgment is a remedy, not a cause of action.  In order to avoid waiving its right to appeal the matter, or to revive the claim if there is a change in the law, LVMPD repleads the declaratory judgment claim, but with a strikethrough in acknowledgment that it has been dismissed.

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

159. A person ~~"whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."~~

160. ~~Pursuant to Nevada and/or Federal Law, LVMPD seeks a declaration (1) that Defendants have breached their contract with LVMPD; or, alternatively, (2) that LVMPD has not accepted the contract for the contract for the construction and installation of the radio system in question (or that acceptance has been properly revoked); and (3) in either event, delineates the rights of the parties concerning any matters, issues or disputes raised by this Complaint.~~

~~**FIFTH CLAIM FOR RELIEF**~~[45]
~~**(Unjust Enrichment – Against all Defendants)**~~

161. ~~LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 160 as though fully set forth herein.~~

162. ~~Pled in the alternative pursuant to Federal Rule of Civil Procedure 8, Defendants have been unjustly enriched by LVMPD in the amounts LVMPD paid Defendants.~~

163. ~~Plaintiff has no adequate remedy at law.~~

164. ~~Defendants received substantially monies from LVMPD.~~

165. ~~However, Defendants did not appropriately discharge their duties to LVMPD.~~

166. ~~Defendants accepted and have still retained the monies paid by to them LVMPD.~~

167. ~~It would be manifestly unjust and inequitable for Defendants to retain the amounts they have been paid from LVMPD.~~

~~**SIXTH CLAIM FOR RELIEF**~~[46]
~~**(Negligent Misrepresentation/Fraud – Against all Defendants)**~~

---

[45] LVMPD understands that the Court dismissed the unjust enrichment claim with prejudice. In order to avoid waiving its right to appeal the matter, or to revive the claim if there is a change in the law, LVMPD repleads the unjust enrichment claim, but with a strikethrough in acknowledgment that it has been dismissed with prejudice.

[46] LVMPD understands that the Court dismissed the negligent misrepresentation claim with prejudice. In order to avoid waiving its right to appeal the matter, or to revive the claim if the Nevada Supreme Court changes course concerning negligent misrepresentation claims, LVMPD repleads the negligent misrepresentation claim, but with a strikethrough in acknowledgment that it has been dismissed with prejudice.

168. ~~LVMPD repeats, re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 167 as though fully set forth herein.~~

169. ~~Defendants had a pecuniary interest in inducing LVMPG to enter into contracts with them and make payments to them for the radio system.~~

170. ~~In the course of inducing LVMPD to contract with them, Defendants failed to exercise reasonable care or competence in communicating information to LVMPD. Specifically, Defendants failed to exercise reasonable care or competence in making the representations as described in Paragraphs 15-29, 41, 45, and 47-59.~~

171. ~~LVMPD justifiably relied on this information.~~

172. ~~As a direct and proximate result of Defendants' negligent misrepresentations, LVMPD has been damaged in a sum in excess of $10,000.00.~~

/ / /

/ / /

/ / /

**SANTORO WHITMIRE**
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

WHEREFORE, LVMPD prays for relief as follows:

1.　　　For damages against Defendants in an amount to be determined by the trier of fact;

2.　　　For the return of all value paid by LVMPD in connection with the radio communication system and/or rescission as may be appropriate;

3.　　　For any punitive damages that may be awarded by the trier of fact;

4.　　　For any enhanced damages and/or attorney fees as provided for in NRS 41.600/NRS Chapter 598;

5.　　　For an off-set of any ostensible obligations owed to Defendants;

6.　　　For interest against Defendants at the maximum rate allowable by agreement and/or law;

7.　　　For reasonable attorney's fees and costs of suit incurred herein;

8.　　　For a judicial declaration determining the rights and duties of the parties; and,

9.　　　For such other and further relief as may be just and proper.

DATED this 5th day of May, 2015

**SANTORO WHITMIRE**

　　_/s/　James E. Whitmire, Esq.___
JAMES E. WHITMIRE, ESQ.
Nevada Bar No. 6533
JAMES M. JIMMERSON, ESQ.
Nevada Bar No. 12599
10100 West Charleston Blvd., Ste. 250
Las Vegas, Nevada 89135

*Attorneys for Plaintiff Las Vegas
Metropolitan Police Department*

SANTORO WHITMIRE
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SANTORO WHITMIRE**
10001 Park Run Drive, Las Vegas, Nevada 89145
(702) 948-8771 – fax (702) 948-8773

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that I am employee of Santoro Whitmire, and that on May 5, 2015, a true and correct copy of the foregoing **REVISED THIRD AMENDED COMPLAINT** was electronically filed with the Clerk of the Court using the CM/ECF system which will send copies of all counsel of record to receive CM/ECF notification in this case.

                       */s/ Asmeen Olila-Stoilov*
                       An employee of Santoro Whitmire